# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

FILED

03 MAY -9 PH 2: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
MAY: 9 2003

|  |  |  |
|---|---|---|
| LEWIS F. HUMPHRIES and | ) | |
| ROGER D. HUMPHRIES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 01-PT-1555-E |
| | ) | |
| VOLVO TRUCKS NORTH AMERICA, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Volvo Trucks North America Inc.'s ("Volvo") Motion for Summary Judgment, filed on February 18, 2003.

### FACTS AND PROCEDURAL HISTORY

On July 16, 1997, Lewis Humphries purchased a model year 1996 Volvo truck from Saunders Truck Center ("Saunders") in Mobile, Alabama for his son Roger Humphries. *See* Am. Compl. at ¶ 8. According to Lewis Humphries, the truck was purchased in his name, and his son made the payments on the truck. *See* Def. Ex. 3 at 12. Roger Humphries was not a party to any contracts pertaining to the truck. *See* Def. Ex. 4 at 45, 60. The truck was purchased for Roger Humphries for use in the family business, Humphries Logging. *See* Pl. Ex. 8 at 60. Prior to purchasing the truck, neither Lewis Humphries nor Roger Humphries had any conversations with Volvo. *See* Def. Ex. 3 at 47; Ex. 4 at 63.

The purchase of the truck also included a warranty from Volvo. However, plaintiffs note that Lewis Humphries is functionally illiterate, having dropped out of school before completing the fifth grade. *See* Pl. Ex. 7 at 125-26. Plaintiffs also contend that Lewis Humphries is hearing

impaired. *Id.* at 110, 128-29. Volvo contends that Lewis Humphries testified that someone read the warranty provisions to him. *See* Def. Ex. 3 at 38-40. Volvo also asserts that Lewis Humphries testified that he understood the terms of the warranty. *Id.* Plaintiffs counter that Lewis Humphries never read the warranty, and assert that no one ever explained the terms of the warranty to him. *See* Pl. Ex. 7 at 126-28.[1] Instead, Roger Humphries talked to the salespeople, and when they finished Lewis Humphries simply signed the papers. *Id.* at 137. Roger Humphries testified that he did not recall any discussions about the Warranty Registration or any other documents. *See* Pl. Ex. 8 at 46. He testified that he was told that the truck was a "good truck, good transmission, good engine." *Id.* at 43. He also testified that during the purchase of the truck, an employee of Saunders "snatched" a document out of his hand and stated "[t]hey don't need to see that." *Id.* at 54. The dealership filled out the check that Lewis Humphries used to pay for the vehicle. *Id.* at 48-49.

The warranty provided a 12 month/100,000 mile basic warranty, a 36 month/300,000 warranty on the transmission, and a 36 month/300,000 mile warranty on the engine mounting. *See* Def. Ex. 5. The warranty also provided as follows:

> Volvo GM Heavy Truck Corporation warrants each new WHITEGMC and USA manufactured Volvo truck to be free from defects in material and workmanship under normal use and service up to the periods as specified and provided all Volvo GM Heavy Truck Corporation maintenance requirements found in the operator's manual are followed. . . .
>
> . . .
>
> **THIS WARRANTY IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESSED OR IMPLIED INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTY OF**

---

[1] During his deposition, Lewis Humphries was told that his testimony was conflicting. He stated that he may not have understood what Volvo's lawyers were asking him. *See* Pl. Ex. 7 at 127-28.

**MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

**LIMITATIONS** - Volvo GM Heavy Truck Corporation's obligation is limited to, at its option, repair or replacement of parts which are acknowledged by it to be defective.  In the case of acknowledged defective assemblies, exchange with factory rebuilt units may be given. . . .

*NO PAYMENT OR OTHER COMPENSATION WILL BE MADE FOR CONSEQUENTIAL, INDIRECT, OR INCIDENTAL EXPENSES OR DAMAGES OF ANY KIND.*

*Id.* at 1-2 (emphasis in original).  Lewis Humphries testified that he went over the warranty language with the salespeople at Saunders.  *See* Def. Ex. 3 at 37-40.  Lewis Humphries also completed the warranty registration, which Volvo contends also contains language disclaiming any implied warranties and limiting any potential remedies.  *Id.* at 37.  Plaintiffs contend that the Powertrain Warranty Certificate, which covers the transmission and the engine, was not provided to them, nor do they have a copy.

Roger Humphries testified that after the truck was purchased, he realized that the fifth wheel was too low.  *See* Def. Ex. 4 at 66.  He took the truck back to Saunders and Saunders fixed the fifth wheel.  *Id.*  Roger Humphries then noticed a vibration in the truck and brought the truck to the local Birmingham Volvo truck dealer ("Premier").  *Id.* at 66-67, 73.  Roger Humphries testified that Volvo and Premier attempted to repair the truck at no cost to him.  *Id.* at 80, 83, 90-91, 135.  Roger Humphries had to take the truck to Premier several times, and each time he was told that the problem was fixed.  *See* Pl. Ex. 8 at 65-92; Pl. Br. at 5-7.  However, the problem was never fully resolved by Volvo.  Each time that Roger Humphries took the truck in to be repaired, he was unable to use it in his logging business.  Plaintiffs assert that, ultimately, John

Manuel Humphries, a mechanic[2] who is Roger Humphries' brother and Lewis Humphries' son, ultimately resolved the vibration problem. *See* Def. Ex. 1 at 61. Manuel Humphries testified that he was compensated by Volvo for the work that he performed on the truck, and that Roger Humphries was not charged anything. *Id.* Manuel Humphries concluded that certain parts of the truck mount had been manufactured incorrectly, thus causing the vibrations even after certain other parts had been replaced by Volvo. *See* Pl. Ex. 9 at ¶ 51.[3] Once the problem had been corrected, plaintiffs contend, employee Greg Holderfield asked Roger Humphries how the vehicle had been fixed, because they had a couple of other vehicles with similar problems. *See* Pl. Ex. 8 at 133. Roger Humphries had no records on exactly how long his truck was out of service, but Volvo contends that as of "late 1998," it was for no more than a period of several weeks. *See* Def. Ex. 4 at 93-94. Volvo notes that from July 16, 1997 to April 2001, the truck was driven over 326,000 miles. *Id.* at 176; Def. Ex. 6.

According to Volvo, the next alleged problem involved the synchronizer gear, a component of the truck's transmission. Roger Humphries testified that after the vibration was fixed, he did not have another problem with the truck until the "transmission teared up." *See* Def. Ex. 4 at 137. Volvo contends that the first transmission problem, aside from the vibration, occurred in April 2001. *See* Def. Ex. 6; Am. Compl. at ¶ 12. At the time that the truck developed the problem, it was being driven by Joe Watkins. *See* Def. Ex. 4 at 143. Volvo notes that Roger Humphries did not know where, when, or if Joe Watkins had been trained to drive a truck, although he did state that Watkins had a commercial driver's license. *Id.* at 143-44.

---

[2]For a detailed description of Manuel Humphries' qualifications and training, *see* Pl. Br. at 7-8.

[3]For a detailed description of the work done by Manuel Humphries, *see* Pl. Br. at 8-10.

4

Volvo also contends that Roger Humphries stated that driver error can damage a transmission, and that the transmission in his truck could have been damaged as a result of how it was operated. *Id.* at 142. Watkins had been operating the truck approximately two or three months when the truck developed the transmission problem. *Id.* at 146. The mechanics at the dealer in Birmingham told Roger Humphries that the damage was caused by driver error and was therefore not covered under the warranty. *Id.* at 138. However, Roger Humphries also contends that he took the transmission to others and was told that the problem could have been the way the truck was machined at the factory, or the way that it had been put together at the factory. *Id.* at 142. He also contends that when he went to pick up the truck he was told that "they done spent all the money on that truck that they're going to spend." *Id.* at 149. Roger Humphries paid for the transmission to be repaired and put it back into service with a different driver. *Id.* at 151-52. Plaintiffs contend that, when Roger Humphries paid to repair the truck, the truck was still under warranty.[4] Approximately three days later, the truck developed another transmission problem. *Id.* at 155. Roger Humphries was again told that the truck was not under warranty and that the defendant had spent all the money it was going to spend on the truck. *Id.* at 158-61. Roger Humphries declined to have the truck repaired. *Id.* at 177-78.

Plaintiffs filed this lawsuit in the Circuit Court of Calhoun County, Alabama on May 11, 2001. Volvo removed the action to this court on June 20, 2001. Plaintiffs filed an amended complaint on March 21, 2002. Plaintiffs allege (1) breach of express warranties (Count II), (2) breach of implied warranty of merchantability (Count III), (3) breach of the implied warranty of

---

[4]Plaintiffs contend that the transmission components were covered under a 60 month/500,000 mile warranty, while the transmission/driveline/rear axle was covered under a 36 month/360,000 mile warranty. *See* Pl. Ex. 12.

fitness for a particular purpose (Count IV), (4) breach of the statutory warranties (Count IV

[sic]), (5) breach of warranty/revocation of acceptance (Count V), and (6) tortious interference

with business relations (Count VIII).[5]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for

summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477

U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could

not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)

(quotation omitted). The non-moving party then bears the burden of pointing to specific facts

demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-

moving party "must either point to evidence in the record or present additional evidence

'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).

Summary judgment is required where the non-moving party merely repeats its conclusory

allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265

---

[5]Plaintiffs also alleged breach of contract (Count I); however, they acknowledge that this claim would be merged with the breach of express warranties claim, and thus they voluntarily dismiss the breach of contract claim. They also voluntarily dismissed their fraud claim (Count VI), because it is barred by the statute of limitations. Finally, the conversion allegations (Count VII) were alleged against defendants that have been dismissed from the action. *See* Pl. Br. at 1 n.1-3.

F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Implied Warranties (Counts III, IV, and IV [sic])

#### A. Defendant's Position

Volvo argues that the implied warranty provisions in the Alabama code cited by plaintiffs apply only to "sellers" of a product, and not manufacturers. *See, e.g., Wellcraft Marine v. Zarzour*, 577 So. 2d 414 (Ala. 1990). In *Wellcraft*, which involved a claim of breach of implied warranty against a boat manufacturer, the court stated that "[r]egardless of any express warranties that a manufacturer may wish to give with a product, by their very language the commercial code's implied warranty section apply to the seller of the product." *Id.* at 419. The court went on to hold that "there is no right of action on an implied warranty theory against a *manufacturer* for property damage without privity of contract." *Id.* (emphasis in original). *See also Rhodes v. General Motors Corp.*, 621 So. 2d 945 (Ala. 1993). Finally, the court in *Wellcraft Marine* held that an express warranty does not, as a matter of law, establish privity of contract. 577 So. 2d at 419. Here, Volvo notes, plaintiffs are suing for economic damages, not

7

personal injury damages. There is no evidence that plaintiffs were in privity of contract with Volvo. Thus, Volvo argues, under *Wellcraft Marine* and *Rhodes*, all claims involving implied warranties must be dismissed.

Moreover, Volvo argues, it disclaimed all implied warranties. The express warranty, which Volvo argues undisputably covers the claims at issue, clearly stated, in conspicuous, boldface type, that there were no other warranties other than those listed. The language specifically excluded implied warranties in general, and the implied warranties of merchantability and fitness for a particular purpose specifically. *See* Def. Ex. 5. The express warranty also clearly stated that no payment would be made for consequential, indirect, or incidental expenses or damages of any kind. *Id.* Volvo argues that these disclaimers are valid under Ala. Code § 7-2-316 and § 7-2-719. Volvo contends that Alabama case law also affirms the right of a seller to limit the remedies available to a buyer for breach of warranty. *See, e.g., Fleming Farms v. Dixie AG Supply, Inc.*, 631 So. 2d 922 (Ala. 1994); *Morgan Bldg. & Spas, Inc. v. Gillett*, 762 So. 2d 366 (Ala. Civ. App. 2000). Volvo cites *Money v. Willings Detroit Diesel, Inc.*, 551 So. 2d 926 (Ala. 1989) as a case with a similar warranty provision. In *Money*, the court noted that the warranty "specifically disclaims the implied warranties of fitness for a particular purpose and merchantability and does so in a conspicuous way." *Id.* at 927. The court concluded that "[s]uch exclusions of warranties, if done conspicuously, are allowed in Alabama," even though the defendant knew that the plaintiff was using the product for a particular purpose. *Id.* at 928 (*citing* Ala. Code § 7-2-316).

Finally, Volvo argues, Alabama law allows the exclusion of consequential damages, particularly in contracts between commercial entities. *See Southland Farms, Inc. v. Ciba-Geigy*

8

*Corp.*, 575 So. 2d 1077 (Ala. 1991). Volvo notes that in *Southland Farms*, consequential

damages, by the nature of the product's intended use, were inevitable when the defendant's

product did not work as advertised. Nevertheless, the court reasoned that

> Commercial parties may contract freely to limit the remedies available to them.
> An agreement between parties in a commercial transaction "may provide for
> remedies in addition to or in substitution for those provided in this article and may
> limit or alter the measure of damages recoverable under this article, as by limiting
> the buyer's remedies to return of the goods and repayment of the price or to repair
> and replacement of nonconforming goods or parts . . . ."

*Id.* at 1079-80 (*quoting* Ala. Code § 7-2-719(1)(a)).

### B. Plaintiffs' Response

Plaintiffs concede that, generally, implied warranties do not apply to manufacturers. *See*

*Wellcraft Marine*, 577 So. 2d at 419. However, plaintiffs argue, the Alabama Supreme Court has

recognized an exception to the general rule when a jury could find that the dealer was an agent of

the manufacturer. *See Massey-Ferguson, Inc. v. Laird*, 432 So. 2d 1259, 1263 (Ala. 1983). In

*Massey-Ferguson*, plaintiffs argue, the court found that the dealer was the agent of the

manufacturer based, in part, on the fact that the manufacturer's literature was about the dealer's

premises, and because its employees accompanied the dealer's employees when attempting to

repair the machine. *Id.* at 1262. Plaintiffs contend that since Lewis Humphries is illiterate, the

presence of literature is irrelevant. Instead, they note that at the time Lewis Humphries signed

the paperwork, he believed that Sanders was part of Volvo. *See* Pl. Ex. 13 at ¶ 4. Plaintiffs note

that when they had problems with the truck, they took it to Saunders to be repaired by Volvo. *Id.*

at ¶ 5. Later, they took it to Birmingham to be fixed by Volvo. *Id.* As stated by Lewis

Humphries, "We dealt with Volvo in Birmingham, Volvo in Mobile, Volvo in Atlanta, and

Volvo finance, and as far as I was concerned, it was all Volvo." *Id.* at ¶ 6. Thus, plaintiffs

9

argue, there is a triable issue of fact as to whether Saunders, who knew the purpose for which the truck was being purchased, was an agent of Volvo.

Plaintiffs also concede that Alabama law allows for the limitation and/or exclusion of implied warranties. However, they argue that the limitations/exclusions were ineffective in this case. Plaintiffs note that, generally, an illiterate person cannot avoid the effects of his signature if he "neglects to have [a document he signs] read, or to enquire as to its contents," absent some fraud, deceit, or misrepresentation. *Mitchell Nissan, Inc. v. Foster*, 775 So. 2d 138, 140 (Ala. 2000)(citations omitted). Here, plaintiffs argue, it is undisputed that Lewis Humphries is functionally illiterate. As to the documents relied upon by Volvo, plaintiffs contend that Saunders' salesmen did not explain to him what was in the warranty documents. Plaintiffs also note Lewis Humphries' hearing problems. Roger Humphries spoke with the salespeople, and when they were through Lewis Humphries signed the papers. Roger Humphries stated that the only warranty that he was told about was the five year, 500,000 mile unlimited use warranty. Roger Humphries was also told that the truck was a good truck and had a good transmission and engine in it. Plaintiffs also note that Roger Humphries had a document snatched out of his hands before he could read it. Finally, they note that Greg Holderfield asked Roger Humphries how Manuel Humphries had fixed the truck, because he had a couple of other trucks with the same problems. Thus, Volvo knew that the truck would not perform as promised.

C. Defendant's Reply

Volvo again argues that the "seller" language found in the implied warranty provisions does not apply to manufacturers. *See Wellcraft Marine*; *Rhodes*. Volvo argues that unlike express warranties, which arise because of an affirmative and express representation (which can

be made by the manufacturer or seller), implied warranties arise as a matter of law, based upon the circumstances surrounding the sale of the goods. Thus, a manufacturer who provides an express warranty is not thereby subject to the implied warranties articulated in the commercial code. Moreover, Volvo notes that it is undisputed that plaintiffs had no contact with Volvo prior to the selling of the truck. Thus, Volvo could not have made any statements that could be construed as implied warranties.

Regarding Lewis Humphries' reading/hearing difficulties, Volvo notes that Roger Humphries was present at the purchase and that he can read and write. *See* Def. Ex. 4 at 22, 43. Volvo also argues that Lewis Humphries is a "poor" reader, as opposed to being completely illiterate. *See* Def. Ex. 3 at 27. Volvo notes that Lewis Humphries failed to inquire as to the substance of the warranty. Volvo also points to several different portions of Lewis Humphries' deposition, including questions by his own counsel, in which he clearly indicated that the warranty provisions were read to him and that he understood them. *See* Def. Ex. 3 at 24-25, 36-40, 126. Volvo also notes that the attorneys for both parties told Lewis Humphries to let them know if he did not understand any questions that were asked. *See* Def. Ex. 3 at 8. Although Lewis Humphries later stated, after a recess with his counsel, that he did not understand the questions that were asked concerning the warranty provision, Volvo asserts that he never indicated that he did not understand the questions at the time they were asked to him. Lastly, Volvo notes that Roger Humphries admitted that it was possible that the warranty provisions were gone over with him, and Lewis Humphries conceded that employees at Saunders spoke at great length with Roger Humphries. *See* Def. Ex. 4 at 47-48; Ex. 3 at 137-38.

Volvo also argues that, even assuming that plaintiffs did not read the warranty or have it

11

read to them, they are still bound by the terms of the warranty.  Volvo also cites *Mitchell Nissan*,

in which the court stated that

> [A] person who signs an instrument without reading it, when he can read, can not,
> in the absence of fraud, deceit or misrepresentation, avoid the effect of his
> signature, because [he is] not informed of its contents; and *the same rule [applies]
> to one who can not read, if he neglects to have it read, or to enquire as to its
> contents*.

775 So. 2d at 140 (emphasis in original)(citation omitted).  Here, Volvo argues, it is undisputed

that Roger Humphries can read and write and that Lewis Humphries failed to inquire about the

terms of the warranty provisions.  Thus, they are still bound by the terms of the warranty.

Finally, Volvo argues, there is no evidence that the employees at Saunders were acting as

the agents of Volvo.  First, Volvo notes, plaintiffs made no allegations nor pled any facts in their

complaint that would support such a finding.  Second, Lewis Humphries stated that he *thought*

that Saunders was part of Volvo, since when he took his truck to Saunders it was being repaired

"by Volvo."  *See* Pl. Ex. 13.  However, Volvo alleges, this is complete speculation, and there is

no evidence to suggest that there was an agency relationship between Saunders and Volvo.

Volvo notes that under Alabama law, a plaintiff must allege facts demonstrating (1) an agency

relationship, (2) that the agent was acting within the line and scope of her authority, and (3) that

the alleged injury was the proximate result of the agent's actions.  *See Robinson v. Allstate Ins.

Co.*, 399 So. 2d 288, 290 (Ala. 1981).  Here, Volvo contends, plaintiffs failed to allege any facts

that could demonstrate an agency relationship, that could show that Saunders was acting within

the scope of its authority, or that could show that Saunders' actions were the proximate cause of

plaintiffs' harm.  Volvo notes that plaintiffs bear the burden of presenting substantial evidence

that Saunders was acting as the agent of Volvo.  *See, e.g., Dickinson v. City of Huntsville*, 822

So. 2d 411, 416 (Ala. 2001).  Moreover, an agency relationship cannot be presumed.  *Dickinson*, 822 So. 2d at 416.

According to Volvo, the only "evidence" that would support plaintiffs' agency theory is the affidavit of Lewis Humphries.  *See* Pl. Ex. 13 at ¶¶ 4-5.  Volvo asserts that Lewis Humphries merely stated that he "thought" or "believed" that Saunders was the agent of Volvo.  However, under Federal Rule of Civil Procedure 56(e), affidavits in opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Volvo also cites *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), in which the court stated that

> [A]n affidavit stating only that the affiant "believes" a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact.  Even if the affidavit is otherwise based upon personal knowledge (that is, includes a blanket statement within the first few paragraphs to the effect that the affiant has "personal knowledge of the facts set forth in th[e] affidavit"), a statement that the affiant believes something is not in accordance with the Rule.

*Id.* at 1278-79 (citations omitted).  *See also Reeves v. Thigpen*, 879 F. Supp. 1153 (M.D. Ala. 1995).  This affidavit simply does not comply with the Rule and therefore cannot be used to create a genuine issue of fact.[6]

Volvo also addresses the issue of apparent authority.  Volvo contends that Alabama law is clear that plaintiffs must show that Volvo held out Saunders as possessing authority to act on its behalf.  *See Kennedy v. Western Sizzlin Corp.*, No. 1010804, 2003 WL 857010 (Ala. Mar. 7,

---

[6]Volvo has filed a Motion to Strike (Doc. 70) making the same arguments.  Plaintiffs oppose said motion. *See* Doc. 71.  Volvo also notes that the affidavit was signed on March 5, 2003, after Lewis Humphries' deposition had been taken.

2003). Apparent authority cannot be based upon the conduct of the alleged agent, but must be

based upon some conduct of the principal. *See, e.g., Wally's, Inc. v. Intergraph Corp.*, 727 So.

2d 34, 37-38 (Ala. 1998). Volvo notes that both Lewis and Roger Humphries testified that they

had no contact with Volvo prior to purchasing the truck. *See* Pl. Ex. 3 at 47; Ex. 4 at 63. Thus,

there can be no claim of apparent authority either.

## II. Express Warranties (Count II)

### A. Defendant's Position

Volvo argues that under Alabama law, a warranty to replace and repair defective parts

does not function as a guaranty of the future performance of the vehicle under warranty. *See,*

*e.g., Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So. 2d 883 (Ala. 1989). In *Tittle*, a

case involving a defective automobile, the court stated that

> In this case the warranty does not go to performance of the equipment. To
> warrant to make needed repairs to leased equipment is not a warranty extending
> to its future performance. All that the supplier promises is that if the equipment
> needs repairs he will make them. It does not promise that in the future the goods
> will not fall into disrepair or malfunction, . . . but only that if it does, the supplier
> will repair it. [Underlying] the warranty to make needed repairs is the assumption
> that the goods may fall into disrepair or otherwise malfunction. No warranty that
> the goods will not, is to be inferred from the warranty to make needed repairs.

*Id.* at 889 (citations omitted). The court went on to state that "a promise to repair is not

necessarily a promise of future performance." *Id.* at 889-90 (citations omitted). Finally, the

court stated that a warranty to repair and replace "does not guarantee that the car will perform

free of defects . . . [but] anticipates that defects will occur." *Id.* at 891. Thus, Volvo argues,

plaintiffs cannot simply allege that the truck did not work properly, but must instead show that

Volvo "refused to repair or replace the malfunctioning component, or failed to do so within a

reasonable time." *Feil v. Wittern Group, Inc.*, 784 So. 2d 302, 310 (Ala. Civ. App.

2000)(citations omitted). According to Volvo, the court in *Feil* realized that the essential purpose of the warranty was not to ensure that the machine worked properly, but simply to ensure that any defective parts would be replaced. *Id.* at 311. *See also Ag-Chem Equip. Co. v. Limestone Farmers Coop., Inc.*, 567 So. 2d 250 (Ala. 1990).[7]

Volvo also notes that the plaintiffs allege that the truck was defective and that due to those defects, it was not fit to be used as a commercial truck. *See* Am. Compl. at ¶¶ 9-10. According to Volvo, plaintiffs must present expert testimony to support this claim. *See Harley-Davidson, Inc. v. Toomey*, 521 So. 2d 971, 974 (Ala. 1988); *Sears Roebuck & Co., Inc. v. Haven Hills Farm, Inc.*, 395 So. 2d 991, 995 (Ala. 1981).[8] Volvo notes that plaintiffs have identified Manuel Humphries as their expert. In his report, Volvo contends, Manuel Humphries stated that there were two problems with the truck: the vibration in the truck, and the transmission, particularly the synchronizer. As to the first problem, the vibration, Volvo contends that it is undisputed that the vibration was ultimately fixed and that Volvo paid all of the costs associated with repairing the vibration. *See* Def. Ex. 1 at 60-61, 123. Volvo argues that its obligation under the warranty was limited to repair and replacement of defective parts, which it fulfilled with respect to the vibration. Moreover, the evidence is undisputed that except for a period of "several weeks," Roger Humphries was able to use the truck. *See* Def. Ex. 4 at 93-94. Indeed, by April of 2001 the truck has over 326,000 miles on it.

As to the transmission problems, Volvo argues, the first record of a transmission problem was in April of 2001, when the truck had over 326,000 miles on it. *See* Def. Ex. 4 at 173-74; Ex.

---

[7]For a discussion of *Ag-Chem Equip.* and *Feil, see* Def. Br. at 15-16.

[8]Volvo argues that plaintiffs have conceded that expert testimony is required. *See* Pl. Motion to Extend Deadlines for Expert Reports at ¶ 4.

6. Therefore, it is undisputed that the truck was no longer covered by the warranty when the transmission problems began. Also, Volvo contends, Manuel Humphries has never even seen or inspected the part of the transmission that he contends is defective. Volvo asserts that Manuel Humphries' opinions concern the second transmission that was installed in the truck after the transmission failed the first time. *See* Def. Ex. 1 at 92. However, Manuel Humphries testified that he has never seen or inspected the second transmission. *See* Def. Ex. 1 at 80-92; Def. Br. at 20-22. In essence, Manuel Humphries testified that, aside from a synchronizer gear, he had never seen or inspected any components of the first transmission (which was repaired on April 2, 2001), nor has he ever seen or inspected any part of the second transmission. Volvo notes that plaintiffs have the burden of showing that their expert is "qualified to testify competently regarding the matters he intend[ed] to address; [ ] the methodology by which the expert reache[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)(citations omitted). Volvo argues that they have not met that burden in this case. Indeed, Volvo notes, Manuel Humphries himself stated that he could not give an opinion as to what caused the second transmission failure without inspecting the complete transmission. *See* Def. Ex. 1 at 79-80, 85-88, 92-93, 98-99, 108; Def. Br. at 23-25.

   B. Plaintiffs' Response

   Plaintiffs argue that express warranties, which are governed by Ala. Code § 7-2-313, "should be treated like any other type of contract and interpreted according to general contract principles." *Ex parte Miller*, 693 So. 2d 1372, 1376 (Ala. 1997).[9] "In Alabama, the crux of all

---

[9]Plaintiffs also note that § 7-2-313 contains the same "seller" language that Volvo argues does not apply to it. Plaintiffs contends that this supports their position that the implied warranties do apply to manufacturers.

express warranty claims is that the good did not conform to the warranty." *Id.* at 1376. Plaintiffs also note that in order to show that the warranty failed of its essential purpose, they must show that the warrantor "refused to repair or replace the [problem] in accordance with the warranty or that the [warrantor] did not repair within a reasonable time." *Id.* at 1377 (citations omitted). Plaintiffs also note that "[e]xactly when it becomes futile to submit a machine to a warrantor for repair is a fact question for the jury." *Id.* at 1379 n.10. Finally, plaintiffs observe that "[t]he fact that [defendant] repaired the hydrostatic system every time and 'absorbed' the costs does not affect [plaintiff's] claim that the limited warranty had failed of its essential purpose." *Id.* at 1378. *See also Lipham v. General Motors Corp.*, 665 So. 2d 190 (Ala. 1995); Pl. Br. at 15-16 (discussion of *Miller* and *Lipham*).

Here, plaintiffs argue, they had constant problems with the truck for over three years. Volvo's efforts to repair the problems were futile, as evidenced by the fact that Manuel Humphries, not Volvo, eventually resolved the vibration problem. Six months later the transmission had to be replaced, for which Volvo refused to pay. Plaintiffs also note that Volvo has produced no evidence of driver error, even though Volvo has argued that driver error negated the warranty. Plaintiffs argue that a reasonable jury could conclude that the warranty failed of its essential purpose, and that plaintiffs were damaged as a result of such failure.

Plaintiffs also address the issue of expert testimony. They admit that at one point they have represented to the court that expert testimony would be required. However, they argue that a subsequent search of the applicable case law demonstrates that, in this case, expert testimony is not required. *See, e.g., Ex parte General Motors Corp.*, 769 So. 2d 903, 913 (Ala. 1999)("Alabama law does not require that an expert witness testify in every case involving an

17

alleged malfunction of a product where the plaintiff has sued alleging a breach of the implied warranty of merchantability."). *See also Volkswagen of America, Inc. v. Dillard*, 579 So. 2d 1301 (Ala. 1991); *Ford Motor Co., Inc. v. Phillips*, 551 So. 2d 992 (Ala. 1989). Plaintiffs argue that since this case is not brought under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), expert testimony is useful, but not required. Plaintiffs argue that Volvo failed to repair and replace the faulty parts, not that there was a defect in the truck.

C. Defendant's Reply

Again, Volvo notes that is undisputed that the vibration problem was ultimately fixed at no cost to plaintiffs. Volvo also distinguishes *Ex parte Miller* relied upon by plaintiffs. According to Volvo, the court in *Miller* carefully explained that the warranty at issue did not "specifically state that it warrants against 'defects' in the product; rather, it warrants the hydrostatic pumps and motors against 'failures.'" 693 So. 2d at 1376. The court further stated that

> If a company such as Pettibone wishes to warrant only defects in material and
> workmanship, then it may do so; with such a warranty, the plaintiff would have to
> show that the product was defective in order to show that the goods did not
> conform to the warranty. Conversely, if a company wishes to warrant against all
> problems with its product, regardless of origin, then it may do that as well. In
> light of the broad language used in this particular component warranty, we can
> see no other interpretation than that it warrants against "failures" of the hydrostat.

*Id.* at 1376 (citations and footnotes omitted). Here, Volvo argues, there is no dispute that the warranty in this case was to repair and replace defects in workmanship and material. With respect to the vibration problems, there is no dispute that the problems were ultimately repaired.

With respect to the transmission problems, Volvo again contends that the first complaint was in April of 2001, not 1998 as suggested by plaintiffs. *See* Def. Ex. 4 at 174-75; Am. Compl.

at ¶ 12.  Volvo also notes that plaintiffs failed to address the fact that the truck had over 326,000

miles on it at the time the transmission problems first occurred.  *See* Def. Ex. 6.[10]  Volvo

contends that it is clear that the truck was no longer covered under the warranty at the time the

transmission problems occurred.  Moreover, Volvo contends, plaintiffs have the burden of

proving that there was a defect in the transmission.  *Miller*, 693 So. 2d at 1376.  It is not up to

Volvo to prove that driver error caused the transmission problems.  The only evidence presented

by plaintiffs is the affidavit of Manuel Humphries, which, as noted above, is unreliable for

several reasons.  Thus, Volvo contends, plaintiffs have failed to present any evidence of a defect

in the transmission, even assuming that expert testimony is not required.[11]  While plaintiffs

contend that they are not alleging a defect but rather failure to repair, there is no duty to repair

absent evidence of a defect.

## III.  Revocation of Acceptance (Count V)

### A. Defendant's Position

Volvo contends that there is no evidence that plaintiffs rejected the truck or notified

Volvo of any alleged breach within a reasonable time as is required by Ala. Code §§ 7-2-607 and

7-2-608.  Indeed, the undisputed evidence shows that plaintiffs used the truck until April 2001,

driving it over 326,000 miles.  After the truck developed a transmission problem, plaintiffs

simply stopped making payments on it.  *See* Def. Ex. 4 at 184.  Even assuming that Ala. Code §§

7-2-607 and 7-2-608 apply to manufacturers, Volvo contends, there is simply no evidence that

---

[10]Volvo notes that for the transmission problem to have occurred in 1998, the truck, given the number of
miles on it, would had to have been driven more than twelve hours a day, seven days a week, at a constant speed of
seventy miles-per-hour.  *See* Def. Reply Br. at 18 n.8.

[11]Volvo continues to assert that expert testimony is required.

the requirements of those statutes have been met.

B. Plaintiffs' Response

Plaintiffs counter that Volvo has been arguing that these provisions do not apply to it. It therefore cannot now cite Ala. Code § 7-2-607 and use it as both a sword and a shield. Thus, plaintiffs argue, they need not comply with its provisions. However, assuming that notice was required, plaintiffs argue that they have provided notice. Plaintiffs note that they gave adequate notice to Volvo of the problems with the truck on several occasions. Moreover, they contacted Volvo finance and told them why they were ceasing payments on the tractor.[12]

C. Defendant's Reply

Volvo argues that Ala. Code §§ 7-2-607 and 7-2-608 apply only to sellers. However, Volvo contends, even if you *assume* that the sections do apply to manufacturers, plaintiffs have failed to comply with the sections. Moreover, Volvo asserts, its argument that these sections do not apply to manufacturer's would not relieve plaintiffs of their obligations to show that they complied with the sections, should this court agree that the sections are applicable to manufacturers.

**IV. Tortious Interference With Business Relations (Count VIII)**

A. Defendant's Position

Volvo argues that the elements of tortious interference with business relations "are 1) the existence of a contract or business relation, 2) the defendant's knowledge of the contract or business relation, 3) intentional interference by the defendant with the contract or business, and

---

[12]Plaintiffs response in this regard seems to be geared toward refuting an argument that notice is required for all implied warranty claims. However, it appears to the court that Volvo has cited §§ 7-2-607 and 7-2-608 with respect to Count V only.

4) damage to the plaintiff as a result of the defendant's interference." *Bama Budweiser of Montgomery, Inc. v. Anheuser Busch*, 611 So. 2d 238, 246-47 (Ala. 1992). Volvo also notes that the plaintiffs must show that Volvo was a "third party" or a "stranger" to the contract with which it allegedly interfered. In other words, plaintiffs must show "the absence of the defendant's involvement in the business relationship." *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 212 (Ala. 2001).

Here, Volvo argues, there is no dispute that it was a party to the express warranty agreement, which demonstrates that Volvo was not a stranger to plaintiffs. Moreover, there is no evidence that Volvo knew of Humphries Logging, or that Volvo undertook any act with the intention of harming Roger Humphries or his business. Indeed, there is no dispute that Volvo sought to repair the truck on several occasions.

B. Plaintiffs' Response

Plaintiffs also note that the elements of tortious interference with business relations "are: 1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; and 5) damage to the plaintiff as a result of the interference." *Soap Co. v. Ecolab, Inc.*, 646 So. 2d 1366, 1371 (Ala. 1994). Plaintiffs argue that the fact that Volvo was not a stranger to Roger Humphries actually strengthens its position that Volvo committed tortious interference. Plaintiffs argue that agents of Volvo knew that he was a logger, and knew that if the truck was inoperable that it would affect his business. Plaintiffs contend that by failing to correct the vibration and refusing to correct the transmission problems, Volvo tortiously interfered with Roger Humphries' business

21

relations.

C. Defendant's Reply

Volvo argues that the only possible relationship that it could have interfered with is the one between Roger Humphries and Humphries Logging.  However, Volvo contends, a person cannot have a business relationship with himself.  Moreover, Volvo asserts, plaintiffs have presented no evidence that Volvo intentionally interfered with Roger Humphries' business.  The vibration was fixed at Volvo's expense and the transmission was not covered under the warranty.  Volvo also again notes that a defendant must be a "third party" or "stranger" to the relationship allegedly interfered with.

## CONCLUSIONS OF THE COURT

Based upon the concessions of the plaintiffs, Counts I, VI, and VII will be dismissed. The court will address the remaining counts in turn.

## I. Revocation of Acceptance (Count V)

Even if the court assumes that Alabama Code §§ 7-2-607 and 7-2-608 apply to this situation,[13] plaintiffs have failed to comply with their provisions.  Section 7-2-608(2) states, in part, that revocation must occur before there is "any substantial change in condition of the goods which is not caused by their own defects."  In this case, it is undisputed that the plaintiffs drove this truck for several years and put over 300,000 miles on it prior to "revoking" their acceptance. It would belie common sense to suggest this truck has not undergone a "substantial change in condition" since the time that it was purchased.

---

[13]There is reason to think that they do not. *See Miller*, 693 So. 2d at 1375 (indicating that a manufacturer is not a "seller" under § 7-2-608.).

## II.  Tortious Interference With Business Relations (Count VIII)

The court agrees with the defendant that there can be no "business relationship" between plaintiffs and Humphries Logging, the company that they own and operate.  The court also notes that, in addition to the elements of the tort cited by the parties, "plaintiffs must produce substantial evidence of fraud, force, or coercion on the defendant's part." *Barber v. Business Prods. Cent., Inc.*, 677 So. 2d 223, 227 (Ala. 1996).  Even assuming that plaintiffs have alleged a proper business relationship (such as between plaintiffs and their customers), and even assuming that defendant should have done more to address the problems with the truck, there is simply no evidence that the defendant's conduct rises to the level of fraud, force, coercion, or similarly culpable conduct.[14]

## III.  Implied Warranties (Counts III, IV, and IV [sic])

The parties seem to agree that, generally, the implied warranty provisions found in the Alabama Commercial Code do not apply to manufacturers.  *See Wellcraft Marine*, 577 So. 2d at 419.  However, as noted above, plaintiffs contend that the general rule does not apply because the various dealers were acting as agents of defendant.  The court cannot agree.  In *Massey-Ferguson, Inc. v. Laird*, 432 So. 2d 1259 (Ala. 1983), cited by plaintiffs, the court specifically stated that the facts in that case were "not sufficient to establish an express agency." *Id.* at 1262.  Since there are even fewer facts here supporting an express agency, this court makes a similar conclusion.

As to apparent authority or authority by estoppel, which was found in *Massey-Ferguson*,

---

[14]The court also points to *Iraola v. CIA, S.A. v. Kimberly-Clark Corp.*, 2003 WL 1643612 (11th Cir. Mar. 31, 2003), and *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285 (11th Cir. 2001), discussing the "stranger" doctrine.

defendant is correct in noting that "the test . . . is based upon the potential principal's holding the potential agent out to third parties as having the authority to act." *Malmberg v. Am. Honda Motor Co., Inc.*, 644 So. 2d 888, 891 (Ala. 1994). Here, plaintiffs admitted that they had no contact with Volvo prior to purchasing the truck. The court acknowledges that there is evidence that the employees at the dealership wore "Volvo" badges and that they claimed to be representatives of "Volvo." There is also the affidavit of Lewis Humphries, in which he stated that he "believed" that Saunders was working with Volvo. However, there is a difference between the defendant Volvo Trucks North America, Inc., and a "Volvo" dealership. Despite plaintiffs' subjective beliefs, there is simply no evidence that *defendant* said or did anything to suggest that the dealers were acting as its agents. There is no evidence to support the theory that the dealers were the agents of defendant, either in fact or by estoppel. Thus, the general rule of *Wellcraft Marine* would apply.

Moreover, even if the dealers were acting as agents, the would still be no claim under a theory of implied warranty because defendant disclaimed such warranties. There can be no dispute that, as a general matter, the disclaimers were conspicuous. The disclaimers were in large, boldface and/or italicized type, clearly stating that there were no implied warranties. The court acknowledges that there is a dispute as to whether the employees of the dealer read the warranty provisions to plaintiffs. There is also the issue of Lewis Humphries' ability to read and/or hear. However, even accepting the plaintiffs' version of the facts, the law in Alabama is that an illiterate person is bound by his signature if "he neglects to have [a document he signs] read, or to enquire as to its contents." *Foster*, 775 So. 2d at 140. Lewis Humphries, who signed the contract, stated that Roger Humphries talked with the employees of the dealership, and that

once they were through talking he simply signed the papers.  *See* Pl. Ex. 7 at 125-28.  Plaintiffs

have pointed to no evidence suggesting that Lewis Humphries asked anyone about what he was

signing, or that he did ask but was given false information.

## IV. Express Warranties (Count II)

Subsequent to filing its briefs in this case, defendant abandoned its position that the truck

was no longer under warranty because of the number of miles on it.  *See* Letter of April 23, 2003

at 3.  Moreover, there is no dispute that two of the problems with the truck, the fifth wheel and

the vibration, were repaired at no cost to the plaintiffs.  Thus, it appears to the court that the only

issue is whether defendant had a duty to repair the third problem, the transmission/synchronizer

gear.  The warranty at issue states that defendant's "obligation is limited to, at its option, repair

or replacement of parts which are acknowledged by it *to be defective.*"  *See* Def. Ex. 5 (emphasis

added).  As stated by the court in *Miller*, with this type of warranty, "the plaintiff would have to

show that the product *was defective* in order to show that the goods did not conform to the

warranty."  693 So. 2d at 1376 (emphasis added).  However, while the burden is on the plaintiffs

to show a defect, the court agrees that expert testimony is not required.  In *Ex parte General*

*Motors*, the court stated that it "has continued to recognize the clear distinction between

AEMLD law and UCC law."  769 So. 2d at 913.  And while that case involved an implied

warranty, the court did state that it "has previously affirmed judgments entered against

defendants in *breach-of-warranty* cases where the plaintiffs did not present the kind of expert

testimony [defendant] argues is required here."  *Id.* (emphasis added).  In fact, *Dillard*, 579 So.

2d 1301, cited by the court in *Ex parte General Motors*, involved an express warranty.

Here, plaintiffs state that they "have not made a claim that the transmission was

defective," but rather that "Volvo breached its warranties with them in failing to replace or repair the transmission." *See* Pl. Br. at 21-22. Given the context in which this statement was made, a discussion of whether or not expert testimony is required, the court assumes that plaintiffs meant that it was not claiming a "defect" in the context of the AEMLD. The fact that plaintiffs still maintain that defendant failed to repair or replace the transmission indicates that they intend to proceed under the express warranty, which includes the "defect" language. The court further concludes that there is some evidence that the transmission was defective. Circumstantially, the court notes that the transmission malfunctioned just three days after the plaintiffs had paid for it to be replaced. It malfunctioned despite the fact that there was a different driver. The transmission had also been replaced before, when the vibration problem was being solved. Moreover, there were the statements from the defendant that it was not going to spend any more money on the truck.

As for direct evidence, there are the statements of Manuel Humphries. The court agrees that he cannot give an expert opinion as to why the *second* transmission failed after it had been replaced by plaintiffs, because he admitted that he has not examined it. However, during his deposition, Manuel Humphries had the first synchronizer gear with him, the one that was taken out when the plaintiffs paid for it to be replaced. He stated that, while he could not give an opinion as to what did cause the transmission problem without examining the whole transmission, the problem was not caused by driver error. *See* Def. Ex. 1 at 79-88. While Manuel Humphries is related to the plaintiffs, he is clearly qualified to give an opinion if properly supported, and credibility determinations are the province of the jury, not this court.

In summary, the court will grant the motion as to the revocation of acceptance, tortious

26

interference with business relations, and implied warranty claims.  As to the express warranty

claim, the court will deny the motion to the extent it involves the repair and/or replacement of

the transmission/synchronizer gear.  There is some evidence to support the theory that the parts

were defective and therefore covered by the express warranty.

This _____ day of May, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE